**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ASLI UYAR, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:16-CV-00186 (VLB) |
| v. | : | |
| | : | **March 31, 2018** |
| EMRI SELI and YALE UNIVERSITY, | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION GRANTING EMRI SELI'S MOTION FOR SUMMARY
JUDGMENT [DKT. NO. 62] AND GRANTING IN PART AND DENYING IN PART
YALE UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 63]**

I.  **Introduction**

Now before the Court are Defendants Emri Seli's ("Seli") and Yale

University's ("Yale") motions for summary judgment as to all pending claims.

Plaintiff Asli Uyar brings this case under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e, et seq., alleging that Yale is vicariously liable for sexual

harassment perpetrated by Seli.  Plaintiff also initially raised claims for Title VII

retaliation and common law negligent supervision against Yale and defamation

and invasion of privacy against Seli.  However, she has not opposed summary

judgment on any of these claims.  Consequently, the Court GRANTS Seli's Motion

for Summary Judgment in full, and GRANTS Yale's Motion for Summary

Judgment as to the retaliation and negligent supervision claims.  For the reasons

that follow, the Court DENIES Yale's motion as to Plaintiff's sexual harassment

claims.

## II.  Facts

### A.  Background

Plaintiff is a Turkish national with a Ph.D. in computer science.  [Dkt. No. 41 ¶¶ 4-5].  Seli is a Professor of Obstetrics and Gynecology and Reproductive Sciences at the Yale School of Medicine.  *Id.* ¶ 7.  Plaintiff first met Seli in Turkey where they discussed possible post-doctoral opportunities for Plaintiff.  [Pl. Dep. at 50-51].  Plaintiff joined Yale on August 17, 2011 as a Post-Doctoral Fellow in Seli's laboratory, and she was granted a visa to work in the United States in this position.  [Def. Exh. B; Def. Exh. C at YALE 000283-84; Def. Exh. E].

In 2013, Plaintiff received a second one-year appointment from Yale as a Post-Doctoral Associate, with a salary of $46,686.70.  [Def. Exh. E; Def. Exh. F]. While Plaintiff's position was initially funded by a grant from an organization in Turkey, by 2013-2014, Plaintiff's position was entirely funded by grants obtained and controlled by Seli.  [Pl. Exh. A at 4].  Seli had complete discretion to hire a post-doctoral researcher and also decided whether to renew a post-doctoral researcher's position.  [Taylor Dep. at 32-34].

In her roles as a Post-Doctoral Fellow and Post-Doctoral Associate, Plaintiff performed bioinformatics research in the area of early embryo genetics in Seli's laboratory.  [Def. Exh. C at YALE 000283-84; Dkt. No. 41 ¶ 6].  Seli was Plaintiff's Principal Investigator, but her field of study was distinct from his, and she worked largely unsupervised.  [Pl. Dep. at 99, 177; Seli Dep. at 18-23].  Seli was physically present in his lab very rarely as he had both teaching and clinical responsibilities for which he was responsible.  [Pl. Dep. at 86-87; Seli Dep. at 10].

**B.  Plaintiff's Relationship with Seli**

In the summer of 2012, Plaintiff and Seli began a sexual relationship that lasted nearly two years.  [Pl. Dep. at 25].  Plaintiff has described the relationship as consensual and romantic, and frequently told Seli that she loved him.  [Pl. Dep. at 25-26, 48-49; 55-57, 128-29; Def. Exh. G. at MSG000007, 16-17, 18-19, 21, 24-25, 28-35, 37, 40, 43, 46-47, 50-51, 53, 61, 63, 68-71, 73-74, 76, 80, 85, 89, 92-93, 97, 99, 121, 123-26, 128, 130-32, 134, 137-38, 144, 146-49, 151, 153-54, 157, 159, 161, 172, 174-76, 179-81, 183-89].  Plaintiff attempted to end the relationship a few times. However, Plaintiff maintains that at multiple points during her relationship, Seli told her that if she tried to end the relationship "it wouldn't be possible for both of us to work at Yale."  [Pl. Dep. at 19; see also, Pl. Dep. at 55, 189].  While Seli did not tell her that he would fire her if she did not have a relationship with her, he did tell her that "one of us has to leave Yale if someone learns about [the affair]."  [Pl. Dep. at 55].  Plaintiff understood that by this Seli meant that Plaintiff would be the one to leave Yale.  *Id.*

Text messages between Seli and Plaintiff suggest that Seli was unwilling to allow the relationship to lapse.  For example, in November 2013, Seli wrote to Plaintiff, "I called you but could not reach you . . . I was expecting you to be with me today . . . I am writing you in 'bottomed out' condition."  [Pl. Exh. E at Plaintiff000229].  Plaintiff did not respond to this message.  Several hours later the following exchange took place:

Seli:        Would you like to go to Turkish Restaurant with me and Elnur?

Plaintiff:    Why? No I would not.

| Seli: | We have to be together |
|---|---|
| Plaintiff: | Does Elnur have to be with us too?  I don't get [it]? |
| Seli: | He does not have to.  I thought he could make the situation normal, lower the probability of us crying.  It does not have to be Elnur.  It can be anyone else.  Or it can be only you and me.  Or we can go to a movie theater.  The only condition, I don't want to talk about anything serious. |
| Plaintiff: | I appreciate your effort.  I am not willing to be in a normal situation now. |
| Seli: | No need to appreciate.  I am doing this only for myself, as you want.  Can we do something together? |
| Plaintiff: | I think you are really confused and cannot think properly.  Would you like to think without getting together for a while?  Would be better. |
| Seli: | I think you don't get the situation.  I am suffering physically (not only emotionally).  I feel deprived like a drug addict.  Anyhow we won't be able to get together for a while (at least 2 weeks).  But let it be as you wish.  On the other hand, I suggest we meet on Saturday. |
| Seli: | My thoughts were all around the place.  It would have been rejected if that was a grant.  I MISS YOU. |
| Plaintiff: | That is what I am saying, let's think of it like a grant and define specific aims ☺ |
| Plaintiff: | You need to think in a structured way. |
| Seli: | I don't have to do everything you ask me to do ☺ |
| Plaintiff: | As long as we are together, I have to do everything you want me to do. |

[Pl. Exh. E at Plaintiff000229-31].  A few days after this conversation, Seli wrote to

Plaintiff, "I would like to see you a lot.  I will be in the office."  *Id.* at

Plaintiff000233.  Plaintiff responded, "It might not be good to see each other."  *Id.*

Seli responded, "You are right.  But staying away did not work either."  *Id.*  In

4

March 2014, Plaintiff told Seli that she wanted to end the relationship. Seli responded, "What does it mean it is over? . . . Have you gone insane? I turned the world upside down in the past 10 days so everything could go as we planned . . . . I love you so so much. And it is not possible for me to be without you. Nothing is over for me and nothing will end." *Id.* at Plaintiff000318.

Seli also got upset with Seli if she did not answer his calls. For example, the following exchange took place on November 22, 2013:

> Seli: Hi. You have been more unreachable than I expected tonight. I am a bit upset. Good night.
>
> Plaintiff: I don't understand what you mean but good night.
>
> Seli: It bothered me deeply that you did not have a desire to communicate with me all night long. You were not online on Skype either.
> . . . .
> Seli: I was jealous. You were offline on Skype all night . . . . Why were you offline on Skype? I thought you don't want me to reach you and got VERY upset.

*Id.* at Plaintiff000242. Similarly, on December 26, 2013, Seli wrote to Plaintiff, "I was hoping to talk to you but could not. Maybe tomorrow. I hope everything is ok about us. Don't upset me." *Id.* at Plaintiff000270.

On May 31, 2014, Seli's wife, Dr. Meltem Seli, discovered Plaintiff's relationship with Seli when she saw WhatsApp messages from Plaintiff to Seli. [Pl. Dep. at 132, 134; Def. Exh. H at 3]. Seli told Plaintiff about his wife's discovery in the following WhatsApp message exchange:

> Seli: Meltem saw the messages which we sent in the morning. I (we) have hard days ahead. It is not a simple issue to talk on the phone. I am trying to get my head together. I miss you so much.
>
> Plaintiff: I am sorry. I don't know what to say.

| Seli: | I am worried. She will give a harsh and serious reaction. It will also impact our professional life. I am not thinking of anything for now. Instead, I'll drink a cup of tea. |
|-------|------|
| Seli: | [My son] has many exams in this year and I have to study with him. I don't have time for the grant. |
| Plaintiff: | What did you say to her? |
| Plaintiff: | I can call you if you want? |
| Seli: | I said that we were so close and you were [precious] to me. |
| Plaintiff: | Are you available to talk right now? |
| Seli: | Yes. |

[Def. Exh. G at MSG000194-05].

Following his wife's discovery of the affair, Seli ended his relationship with Plaintiff. [Pl. Dep. at 51, 128-29; Def. Exh. H at 3]. After June 1, 2014, Plaintiff never received "an explicit invitation to engage in intimate relations with Seli. [Pl. Dep. at 52]. Plaintiff did not submit to or reject a sexual proposition from Seli after June 1, 2014. [Pl. Dep. at 52]. Plaintiff also admits that she was not subjected to any sexual remarks after June 1, 2014. [Pl. Dep. at 71].

C. Seli's Post-Breakup Actions

On June 1, 2014, (the day after his wife discovered the affair) Seli made the decision to cancel the "imprinting project," one of the projects Plaintiff had been working on. [Pl. Dep. at 62, 81; Def. Exh. H at 3; Def. Exh. K; Def. Exh. L at YALE 001357-58]. Prior to May 31, 2014, Plaintiff reported to Seli that the research results were not as expected and that there was a problem with the research mouse colony that very likely caused the problem. [Pl. Dep. at 62-64]. Seli shared Plaintiff's findings with their collaborator, Dr. Maria Lalioti, on May 30, 2014. [Def. Exh. K]. Lalioti remarked in a May 30, 2014 email that the results of this project did not "seem promising," but the parties dispute whether Seli

planned to continue funding the project prior to his wife's discovery of the affair. [Pl. Exh. K].

Also on June 1, 2014, Seli emailed Colleen Goble, Manager of the Department of Obstetrics/Gynecology, stating:

> Asli's project does not look promising for the next year and I think we may not renew her appointment.
>
> As far as I know we have to decide 6 weeks in advance.
>
> Please remind me in time; but as I said, we'll probably not reappoint.

[Def. Exh. N]. Plaintiff was not copied on this email and first learned about it months after she left Yale to join Jackson Laboratories, her current employer. [Pl. Dep. at 188; Def. Exh. O at 1]. Seli ultimately did not terminate Plaintiff's employment, and Yale promoted her to Associate Research Scientist effective August 17, 2014. [Pl. Dep. at 183-84; Def. Exh. H at 4; Def. Exh. P at 1-2].

Also on June 1, 2014, Seli sent an email canceling a trip that Plaintiff was supposed to take to a professional conference in July 2014. [Def. Exh. R; Pl. Dep. at 139-40]. In the same email canceling Plaintiff's arrangement for the July conference, Seli approved payment for Plaintiff to attend a different conference in Honolulu, Hawaii in October 2014. [Pl. Dep. at 139; Def. Exh. R]. Plaintiff was copied on this email. According to Plaintiff, prior to sending this email, Seli spoke with her and explained that she could not attend the original conference because Seli was attending, and that they could not both attend because his wife knew about their relationship. [Pl. Dep. at 140-41, 143]. Plaintiff ultimately attended the October 2014 conference at Yale's expense, even though she was no longer affiliated with Yale. [Pl. Dep. at 141-42].

In the weeks following June 1, Plaintiff and Seli spoke on several occasions. [Pl. Dep. at 156]. Seli and Plaintiff also met in person at a Starbucks on June 1, 2014. After this meeting, they had no communication or contact for several days. [Def. Exh. H. at 7-8]. On June 4, 2014, Plaintiff sent Seli an email telling him that they had to talk. [Def. Exh. S at 1, 3]. Plaintiff and Seli had an 11 minute telephone conversation on June 4, 2014. [Def. Exh. H at 8; Def. Exh. T at YALE 000149-151]. Plaintiff also alleges that Seli called her on June 8, 2014, during which call Seli told Plaintiff he would help her find employment elsewhere. [Def. Exh. H at 8]. Plaintiff also contends that Seli threatened to tell her family about their relationship if she chose not to leave Yale. [Pl. Dep. at 31-36, 70]. Plaintiff eventually told people about the relationship on her own. [Pl. Dep. at 70]. Plaintiff testified that between June 1 and June 17, 2014, Seli asked Plaintiff to leave Yale, and said that she could not continue working with him at Yale, and that if she returned to the department he would "just show up and try to humiliate" her. [Pl. Dep. at 156].

Seli left for a family trip to California on June 12, 2014 and remained in California until June 22, 2014. [Def. Exh. H at 16]. On June 17, 2014, while Seli was on vacation, Plaintiff received an email from Sarah Henderson, an Immigration Specialist in Yale's Office of International Students and Scholars, which stated:

> According to our records your current J-1 status will end as of Aug. 16, 2014. This email is both for those of you who will be continuing your appointments at Yale and for those who will be departing Yale at the end of your current appointment. Please read the appropriate paragraph.

8

[Def. Exh. H at 16, Def. Exh U at 001111-12]. The email went on to explain what steps the visa holders needed to take based on whether the visa holders planned to stay with Yale or conclude their appointments. [Def. Exh. U at YALE 001111-12]. This form email is sent to all individuals whose visas were due to expire (whether or not their appointments were being continued). [Pl. Dep. at 137, 150-52; Def. Exh. U at YALE 001111-12]. One June 18, 2014, Plaintiff forwarded the email to Seli, and asked, "[d]id you take any action for this? Do I need to do anything?" [Def. Exh. U at YALE 001111-12]. Seli stated in his reply to Plaintiff's June 18, 2014 email, "Hi Asli, I will communicate to Colleen as we have discussed. I am not sure if you need to do anything else (other than receiving your certificate)." *Id.* at YALE 001111. By this he meant that Plaintiff's appointment would not be renewed. *Id.* However, Seli claims that he believed Plaintiff did not want continue at Yale. [Def. Exh. H at 16; Pl. Exh. H at 5-6].

On June 18, 2014, Plaintiff replied to Seli's email and stated that she was surprised because she understood that her position was being renewed. [Def. Exh. U at YALE 001111]. Once Plaintiff made her position known to him, Seli wrote to her that there must have been a miscommunication, that Plaintiff would be receiving a reappointment letter shortly and that he would "be happy to sit down and talk to [Plaintiff] regarding [her] future career pathways." *Id.* at YALE 001110. Plaintiff then gave Seli a deadline to meet with her by June 24, 2014, and Seli agreed. *Id.*

Plaintiff and Seli met at 2:00 pm on Tuesday, June 24, 2014. [Pl. Exh. U at YALE 001110; Pl. Dep. at 162]. On June 24, 2014, Plaintiff met Seli in the fellows'

office.  [Pl. Dep. at 165].  At their June 24, 2014 meeting, Plaintiff told Seli that he needed to divorce his wife and leave Yale, or she would file a complaint against him.  [Pl. Dep. at 165, 167-68].  Plaintiff believed that if Seli agreed to divorce his wife and leave Yale, justice would be served because they both would have been punished.  [Pl. Dep. at 153-55, 219-20].  Seli refused.  [Def. Exh. H at 4].  After their June 24, 2014 meeting, Seli did not sent Plaintiff any emails, text messages, or call her on the phone.  [Pl. Dep. at 201].  Plaintiff saw Seli only once after June 24, 2014, when she ran into him in the hallway.  [Pl. Dep. at 201].

### D. Plaintiff's Complaint to Yale

After her meeting with Seli, on June 24, 2014, Plaintiff met with Dr. Hugh Taylor, Chair of the Obstetrics/Gynecology Department and told him that she had a consensual relationship with Seli.  [Pl. Dep. at 73-75; Def. Exh. H at 11]. Plaintiff's meeting with Taylor was the first time Plaintiff complained to anyone at Yale about Seli.  [Pl. Dep. at 150].  Plaintiff was upset and crying during her meeting with Taylor.  [Pl. Dep. at 72-73].  At that meeting, Plaintiff told Taylor that she believed Seli was trying to get rid of her for personal reasons.  She told Taylor that Dr. Seli was refusing to continue her appointment and that he had told her not to come to the lab and had cancelled her registration at the professional conference.  [Def. Exh. H at 11; Pl. Dep. at 74-76].

On June 24, 2014, after meeting with Dr. Taylor, Plaintiff met with Valarie Stanley, Senior Deputy Title IX Coordinator, and made the same complaints to Stanley.  [Def. Exh. H at 11]. Stanley reassured Plaintiff that she would not be punished, and "suggested that if Plaintiff was applying for other jobs that

whatever references Seli provided could be sent through the office of the Department Chair or her own office in order to alleviate any concerns she might have that Seli would retaliate against her" for her June 24, 2014 complaints. *Id.* Plaintiff met with Stanley a second time on July 1, 2014. [Pl. Dep. at 96-97]. The purpose of the July 1, 2014 meeting was to allow Aley Menon, Secretary of Yale's University-Wide Committee on Sexual Misconduct ("UWC"), to explain the UWC complaint process to Plaintiff so that she could decide whether she wanted to file a UWC complaint against Seli or continue with the Title IX informal process. [Pl. Dep. at 96-99; Def. Exh Y at YALE 000917-18]. After learning about the UWC process, Plaintiff decided to continue with the Title IX informal process. [Def. Exh. Y at YALE 000918; Pl. Dep. at 97-99].

After Taylor learned about the affair, he ordered Seli to stay away from his lab and told Plaintiff she should continue to report to work as she desired. [Pl. Dep. at 184; Taylor Dep. at 47-48, 66-67, 71-72, 79-80]. Taylor also told Plaintiff that she could work for Taylor in his laboratory if she preferred. [Pl. Dep. at 75-76; Def. Exh. H at 11]. Plaintiff testified that at first she returned to Seli's laboratory, but that Seli prevented her from regaining access to the projects that she was working on. [Pl. Dep. at 70]. On June 30, 2014, Plaintiff received an email from Leslie Radcliff attaching a letter from Seli appointing her to the faculty position of Associate Research Scientist, effective August 17, 2014. [Pl. Dep. at 38-39; Def. Exh. P at 1-2]. The Associate Research Scientist position was one that Plaintiff and Seli had discussed prior to June 1, 2014. [Pl. Dep. at 138-39]. The appointment letter was drafted by Seli on June 24, 2014, and Radcliff apologized

in her email for the delay in sending the letter, and explained that the "letter was written on 6/24 and was placed in my campus mailbox. It was mi[xed] in with the Fellowship mail that I have been receiving 'tons of' all week." [Def. Exh. P at 1; Pl. Dep. at 39]. The position offered to Plaintiff was a faculty position and the salary reflected an 11% increase to her salary (from $46,686 to $52,000). [Def. Exh. H at 11; Def. Exh. P at 2; Def. Exh. Q].

E. **Plaintiff's Career Choices Following Her Complaint**

After receiving her reappointment letter on June 30, 2014, Plaintiff "decided to accept Dr. Taylor's offer to work in his research group rather than Dr. Seli's." [Pl. Dep. at 70, 86; Def. Exh. H at 12]. However, she developed the impression that Taylor did not truly want her to work in his lab. [Pl. Dep. at 77]. While she was able to work on one project within Taylor's lab, she did not feel fully included in the work of the lab, because she did not receive any direct communication about the lab's work, she was not directly assigned to any specific research projects, and she was not given the opportunity to continue any of the work she had begun while working for Seli. [Pl. Dep. at 82-84]. Plaintiff worked in Taylor's lab beginning in mid-July 2013 through mid-August 2014, when she left the country to travel to Turkey for a few weeks. [Pl. Dep. at 69, 70]. While working in Taylor's lab, she found everyone friendly and attended at least one lab meeting. [Pl. Dep. at 87, 89; Def. Exh. W at 84-85].

In July 2014, Seli provided letters of recommendation for Plaintiff and she received job offers from Cornell University/Weill Medical Center and Jackson Laboratories, and Plaintiff testified that she never doubted that Seli would do so.

[Pl. Dep. at 42-44; Def. Exh. Z at 1-4].  On August 5, 2014, Jackson Laboratory, which Plaintiff considers a prestigious research institution, sent Plaintiff an offer letter for the position of Application Computational Scientist.  [Pl. Dep. At 195; Def. Exh. O at 1-2].  While Plaintiff ultimately chose to leave Yale, she testified that she "didn't want to.  I mean who would want to leave Yale?  Especially in my situation in postdoc working on a very important research project.  And . . . I was going to gain writing experience on writing grants.  Which is crucial for being an independent researcher.  So I was very close to complet[ing] my project, publish[ing] my work, and then gain[ing] experience on grant writing and be[ing] an independent supervisor."  [Pl. Dep. at 189].

Plaintiff's starting salary for her position at Jackson laboratory was $70,000, and $18,000 increase over Plaintiff's last Yale salary of $52,000.  [Def. Exh. F; Def. Exh. O at 1].  The Jackson Laboratory offer letter informed Plaintiff that the position would begin on Monday, September 8, 2014, and required Plaintiff to confirm her acceptance by Wednesday, August 6, 2014.  [Def. Exh. O at 1-2].  Plaintiff signed and accepted the offer letter on August 6, 2014.  [Def. Exh. O at 2].  Plaintiff resigned her employment with Yale on September 5, 2014, and started her employment with Jackson Laboratory on Monday, September 8, 2014. [Def. Exh. O at 1-2].  Since joining Jackson Laboratory in September 2014, Plaintiff has received one bonus, which was 6% of her annual salary.  [Pl. Dep. at 199].  On November 2, 2016, Plaintiff was promoted to the position of Associate Research Scientist and her annual salary was increased to $80,000.  [Def. Exh.

CC].  Plaintiff has published at least two papers since joining Jackson Laboratory.  [Pl. Dep. at 196].

F. <u>Plaintiff's UWC Complaint</u>

On September 25, 2014, after Plaintiff left Yale, she filed a complaint with the UWC.  Yale appointed Miriam Berkman to conduct a factual investigation in Plaintiff's UWC Complaint.  [Pl. Dep. at 11-12; Def. Exh. H at 1].  Berkman interviewed Plaintiff, Seli, Stanley, Taylor, Meltem Seli, and multiple other individuals identified by Plaintiff.  [Def. Exh. H at 1-2].  Berkman summarized her findings in a report.  [Def. Exh. H].  The report included Plaintiff's version of events, and Plaintiff had the opportunity to read the report and correct it if Plaintiff believed anything in the written account was incorrect.  [Pl. Dep. at 12-13; Def. Exh. H at 4-12].  As reflect in the report, Plaintiff told Berkman that she felt loved and wanted by Seli, and that her relationship with Seli was consensual.  [Pl. Dep. at 16-17; Def. Exh. H at 4-12; Def. Exh. J at YALE 000186-87].  Plaintiff also told Berkman that while she was in the relationship she did not believe that she would be punished at work if she did not do as Seli asked.  [Pl. Dep. at 17-19, Def. Exh. H at 6].

Until Plaintiff retained a lawyer, she always maintained that the relationship was consensual.  [Pl. Dep. at 20-21].  Her current position that the relationship was not consensual is only something she arrived at in retrospect.  *Id.* at 53-56.  One of the reasons that Plaintiff changed her opinion regarding whether the relationship was consensual was that friends of hers told her that her affair with

Seli was not consensual under law. [Pl. Dep. at 83]. Plaintiff also testified that because she was raised in a conservative country, she understood a non-consensual relationship to be one that involved rape or physical force. *Id.* at 43. Therefore, when she told investigators that the relationship was consensual, she meant that Seli did not rape her or use physical force to coerce her into having a sexual relationship with him. *Id.* at 9-10.

The UWC ultimately determined that Seli violated Yale's Policy on Teacher-Student Consensual Relationships and failed to manage the conflicts of interest that arose from the relationship. [Def. Exh. DD at YALE 000190]. The UWC recommended (1) suspending Seli from the School of Medicine Faculty for one year (including presence in the research lab and all clinical responsibilities, except patient care in the egg donation practice), (2) prohibition from holding a leadership position in the School of Medicine for five years; (3) reduction of his salary commensurate with the reduction of his responsibilities, (4) no new postdoctoral trainees or other students during the suspension, (5) mandatory counseling and mentoring on managing conflicts of interest, and (6) supervision of all his personnel decisions in the research laboratory for a five-year period. [Def. Exh. EE at YALE 000200-01]. On February 5, 2015, Plaintiff wrote a letter to President Salovey regarding Seli's appeal to Dr. Polak's recommendations. [Def. Exh. FF at YALE 000957]. In her letter, Plaintiff stated that she had "no objections to Provost Polak's decision," although in her opinion she believed that the "termination of Dr. Seli's affiliation with Yale would be the most appropriate penalty." *Id.*

### G. CHRO and EEOC Proceedings

Plaintiff "dual filed" administrative complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on March 31, 2014, alleging quid pro quo sexual harassment, as well as sex discrimination, constructive discharge, and retaliation.  [Def. Exh. GG].  Plaintiff's CHRO complaint described her relationship with Seli as a romantic relationship.  *Id.* ¶ 7.  Plaintiff filed an amended CHRO complaint on June 1, 2015.  [Def. Exh. HH].  The CHRO complaint was ultimately dismissed as untimely, and before the EEOC issued a determination, a Notice of Right to Sue was issued by EEOC on December 1, 2015.  [Def. Exh. II at YALE 000963-66].

### III.  Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance*

*Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)).  "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

IV.   <u>Discussion</u>

Pursuant to Title VII of the Civil Rights Act of 1964, "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  "[S]exual harassment is a form of sex discrimination that is actionable under Title VII."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (expanding Title VII

protections from quid pro quo harassment to hostile work environment harassment). "[A] plaintiff seeking relief for sexual harassment may . . . proceed under two theories: (1) *quid pro quo,* and (2) hostile work environment." *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994). "[S]exual harassment so 'severe or pervasive' as to 'alter the conditions of . . . employment and create an abusive working environment' violates Title VII." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Vinson*, 477 U.S. at 64).

To establish a prima facie case of quid pro quo sexual harassment, a plaintiff must "present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis of decisions affecting the compensation, terms, conditions, or privileges of her employment." *Karibian*, 14 F.3d at 777 (citing *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 898 (1st Cir. 1988)). Actionable unwelcome sexual conduct includes "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Vinson*, 457 U.S. at 65. Quid pro quo sexual harassment claims also lie where a plaintiff has submitted to unwanted sexual advances. *See Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 98 (2d Cir. 2002) ("[W]hen a victim is coerced into submitting to a supervisor's sexual mistreatment, the threatened detrimental economic tangible employment action may not take place. But that does not mean that use of the submission as the basis for other job decisions does not also constitute tangible employment action.").

To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Faragher*, 524 U.S. at 786 (quoting *Vinson*, 477 U.S. at 64). To be actionable, allegedly harassing conduct "must be severe [or] pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) ("[A] plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."). Additionally, the "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787.

"[A] work environment's hostility should be assessed based on the totality of the circumstances." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quotations omitted) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive

utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Id.* "The Second Circuit has consistently 'cautioned against setting the bar [for a hostile work environment claim] too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of his employment altered for the worse.'" *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 186 (E.D.N.Y. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

Defendant seeks summary judgment on the grounds that (1) neither quid pro quo nor hostile work environment claims may lie where mistreatment is simply the result of the fallout of a consensual romantic relationship; (2) Plaintiff's claims are time-barred; and (3) the *Faragher/Ellerth* affirmative defense bars Plaintiff's claims.

A. <u>Plaintiff has Offered Evidence that her Relationship with Seli was not Consensual</u>

Yale argues first that Plaintiff's sexual harassment claims cannot survive because the relationship was consensual. In particular, Yale argues that "Title VII sex discrimination claims may not be premised solely on evidence of mistreatment following the termination of a romantic relationship." [Dkt. No. 64 at 23 (quoting *Novak v. Waterfront Comm'n of N.Y. Harbor*, 928 F. Supp. 2d 723, 729 (S.D.N.Y. 2013))]. However, "there is no *per se* bar against hostile work environment claims based on gender that arise, whether entirely or not, out of a failed consensual relationship. 'To hold otherwise would effectively immunize from Title VII liability any sexual harassment following a failed relationship'"

regardless of the egregiousness or motivation of the conduct. *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 328 (E.D.N.Y. 2014) (quoting *Sclafani v. PC Richard & Son,* 668 F. Supp. 2d 423, 433 (E.D.N.Y.2009)).

Nevertheless, "[i]n cases arising from the break-up of a consensual sexual relationship between coworkers, courts have repeatedly observed that there is a distinction between personal animosity arising from a failed relationship, which is not actionable sexual harassment, and animosity based on a person's gender, which can be." *Kohutka*, 994 F. Supp. 2d at 328 (quoting *Bracey v. Ne. Utilities Serv. Co.*, CV126027883S, 2013 WL 6334262, at *9 (Conn. Super. Ct. Nov. 1, 2013)). "[C]ircumstances in which an employee's failed romantic relationship with a supervisor can lead to an actionable Title VII claim" may include "when the employee's subsequent mistreatment can be tied to the rejected supervisor's unwanted sexual advances or other inappropriate efforts to resume the relationship." *Novak*, 928 F. Supp. 2d at 730 (*quoting Babcock v. Frank*, 729 F. Supp. 279, 287-88 (S.D.N.Y. 1990)). But where "there is no evidence that the spurned supervisor made any sexual advances towards [a plaintiff] following their breakup, or engaged in other efforts to renew the relationship, there is no actionable Title VII violation." *Id.*

The parties do not dispute that Seli made no sexual overtures to Plaintiff following his wife's discovery of the affair on May 31, 2014. However, Plaintiff has testified that she stayed in a relationship with Seli based on her fear that she would have to leave Yale if she revealed the existence of the relationship or if they broke up. The key question in this case, then, is whether Seli's actions

following his wife's discovery of the affair constituted (1) "unfair and certainly unchivalrous behavior"[1] following the dissolution of a voluntary sexual relationship; or (2) the execution of threats that kept Plaintiff from leaving the relationship sooner.

In support of Yale's claim that the relationship was fully consensual, Yale cites to the report of its UWC investigation, which contains a third-party's interpretation of Plaintiff's account of her relationship with Seli. Plaintiff admitted that she had the opportunity to review the report and make changes any inaccuracies to parts of the report. However, she now maintains that where she described having a consensual relationship, she meant that Seli never used physical force or intimidation.

She consistently testified that she believed her job would be in jeopardy if she ended the relationship, and that she wanted to end the relationship on multiple occasions, due to the stress of having to keep the relationship secret, and what Plaintiff perceived as controlling behavior on Seli's part. While the UWC report supports Yale's theory that Seli's behavior after the breakup was based on non-gender-based post-relationship hostility, whether to credit the UWC report or Plaintiff's testimony is best left to a jury. This is particularly true in light of the fact that UWC is controlled by Yale, and a reasonable jury could conclude that statements within a Yale-sponsored investigative report might be unfairly

---

[1] *Kahn v. Objective Sols., Int'l*, 86 F. Supp. 2d 377, 382 (S.D.N.Y. 2000) ("Participation in a consensual office affair does not constitute actionable gender discrimination when the termination of the affair results in discharge. It may constitute unfair and certainly unchivalrous behavior, but not discrimination because of gender.").

biased in favor of Yale. The possibility that a jury would find Plaintiff submitted to unwelcome secular advances by Seli is buttressed by the numerous electronic communications between Plaintiff and Seli in which suggest that Seli resisted Plaintiff's efforts to avoid communicating with him and to end the relationship; and Seli's insistence that she continue the relationship. [*See, e.g.*, Pl. Exh E at 229-31, 233, 242, 270, 318].

The Court also notes that Title VII's requirement that a work environment be subjectively and objectively hostile to constitute discrimination is designed to take into account the reality that sexual advances that might be repugnant to one employee might be welcome or pleasurable to another. It was not designed to shield employers from liability when an employee's understanding of the word "consensual" or her understanding of antidiscrimination law or American values relating to workplace conduct are colored by the norms of less progressive societies. To find otherwise would be to immunize employers from liability for fostering hostile work environments among immigrants from cultures that do not value a woman's right to be free from discrimination in the workplace. Plaintiff's resistance of Seli's advances before his wife learned about the relationship could reflect her subjective feeling that his advances had become unwanted and were unrequited, but that she believed she had no choice but to continue the relationship in order to keep her position at Yale.

B. **Plaintiff has Offered Evidence that Seli's Behavior Before June 4, 2014 was Part of a Course of Conduct that Continued After June 4, 2014**

Defendant next argues that Plaintiff's claims are time-barred. A plaintiff must file a discrimination claim within 300 days of the occurrence of the allegedly

unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Here, the Plaintiff filed her charge of discrimination with the CHRO on March 31, 2014. As a result, discrete incidents that occurred more than 300 days before that date, or before June 4, 2014, generally are time-barred. However, "under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of N.Y. & New Jersey*, 685 F.3d 135, 155-56 (2d Cir. 2012) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)). Moreover, "evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [that] timely claim.'" *Id.* at 150 (quoting *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 176 (2d Cir. 2005)). "Such background evidence 'may be considered to assess liability on the timely alleged act.'" *Id.*

Plaintiff offered evidence that Seli told her that if she ended their relationship or if their relationship was discovered, Plaintiff would have to leave her position at Yale. Consequently, a reasonable jury could conclude that Seli's attempts to remove Plaintiff from her position between June 4, 2014 and June 24, 2014, represented Seli's execution of the threats he made on multiple occasions during their relationship. Thus, genuine issues of fact preclude the Court from finding that Plaintiff's claims regarding Seli's pre-June 4, 2014 conduct are time-barred.

**C.** **Genuine Issues of Fact Preclude Summary Judgment on the Basis of the** *Faragher/Ellerth* **Defense**

*Ellerth* and *Faragher* hold "[a]n employer . . . subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with . . . authority over the employee." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 278 (2009) (quoting *Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 807). "Although there is no affirmative defense if the hostile environment 'culminates in a tangible employment action' against the employee, an employer does have a defense '[w]hen no tangible employment action is taken, if it 'exercised reasonable care to prevent and correct promptly any' discriminatory conduct and 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise,'" *Id.* (citing *Ellerth,* 524 U.S., at 765). "Employers are thus subject to a strong inducement to ferret out and put a stop to any discriminatory activity in their operations as a way to break the circuit of imputed liability." *Id.*

The *Faragher/Ellerth* affirmative defense does not shield Yale from vicarious liability for Seli's actions for three reasons. First, because Plaintiff has offered evidence that Seli denied her access to her existing research projects, and for a short period of time, told her not to come to his lab, he effected what amounts to an "undesirable reassignment," which constitutes a tangible employment action. *See Ellerth*, 524 U.S. at 765 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable

reassignment."). Second, Plaintiff has offered evidence that she was coerced into remaining in a relationship with Plaintiff in order to maintain her position at Yale. "[W]hen a victim is coerced into submitting to a supervisor's sexual mistreatment, the threatened detrimental economic tangible employment action may not take place. But that does not mean that use of the submission as the basis for other job decisions does not also constitute tangible employment action." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 98 (2d Cir. 2002). Because Plaintiff's submission to Seli's advances constitutes a tangible employment action, the *Faragher/Ellerth* affirmative defense is inapplicable. Finally, because Plaintiff testified that Seli threatened that if she revealed the existence of their relationship, she would have to leave Yale, a jury could find that her initial decision not to avail herself of Yale's anti-discrimination apparatus was reasonable.

## V. Conclusion

For the foregoing reasons, Defendant Seli's Motion for Summary Judgment [Dkt. No. 62] is GRANTED and Defendant Yale's Motion for Summary Judgment [Dkt. No. 63] is GRANTED IN PART and DENIED IN PART. Counts Three, Four, Six, Eight, and Nine are DISMISSED, and Seli is DISMISSED as a defendant to this action.


IT IS SO ORDERED.

_____/s/_____

**Hon. Vanessa L. Bryant**

**United States District Judge**


**Dated at Hartford, Connecticut:  March 31, 2018**